FILED - WESTERN DIVISION
CLERK, U.S. DISTRICT COURT

FEB 2 2 2008

CENTRAL DISTRICT OF CALIFORNIA
BY            *P*            DEPUTY

# UNITED STATES DISTRICT COURT

# CENTRAL DISTRICT OF CALIFORNIA

# WESTERN DIVISION

| | |
|---|---|
| TERRELL C. ODEN, | No. CV 06-7512-AHS  (AGR) |
| Petitioner, | |
| v. | ORDER ADOPTING MAGISTRATE JUDGE'S REPORT AND RECOMMENDATION |
| MIKE KNOWLES, Warden, | |
| Respondent. | |

Pursuant 28 U.S.C. § 636, the Court has reviewed the entire file de novo, including the Petition, all the records and files herein, the Magistrate Judge's Report and Recommendation, and the objections to the Report and Recommendation that have been filed herein.  Having made a de novo determination, the Court agrees with the recommendation of the Magistrate Judge.

IT IS ORDERED that Judgment be entered denying the Petition.

DATED:  FEB 2 0 2008  _____

ALICEMARIE H. STOTLER
UNITED STATES DISTRICT JUDGE

FILED - WESTERN DIVISION
CLERK, U.S. DISTRICT COURT

SEP 1 2 2007

CENTRAL DISTRICT OF CALIFORNIA
BY                              DEPUTY

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

TERRELL C. ODEN,                               NO. CV 06-7512-AHS (AGR)

          Petitioner,

          v.                               REPORT AND
                                             RECOMMENDATION OF UNITED
MIKE KNOWLES, Warden,                         STATES MAGISTRATE JUDGE

          Respondent.

The Court submits this Report and Recommendation to the Honorable

Alicemarie H. Stotler, United States District Judge, pursuant to 28 U.S.C. § 636

and General Order No. 05-07 of the United States District Court for the Central

District of California.  For the reasons set forth below, the Magistrate Judge

recommends the Petition for Writ of Habeas Corpus be denied.

///

///

///

///

///

///

I.

## SUMMARY OF PROCEEDINGS

On October 21, 2004, a Los Angeles County Superior Court jury convicted Petitioner of one count of first degree murder (victim Gamora) and one count of conspiracy to commit murder. (Petition at 2; Answer at 1.) On November 15, 2004, Petitioner was sentenced to 75 years to life. (*Id.*) On May 1, 2006, the California Court of Appeal modified an enhancement and one aspect of the sentence but otherwise affirmed Petitioner's conviction in an unpublished decision. (Lodged Document ("LD") 8.) On August 16, 2006, the California Supreme Court denied review without explanation. (LD 10.)

On November 25, 2006, Petitioner filed a Petition for Writ of Habeas Corpus by a Person in State Custody in this Court in which he raised thirteen grounds: (1) the trial court erred in denying Petitioner's motion to dismiss a juvenile strike; (2 and 3) the use of Petitioner's prior juvenile adjudication violated his due process rights; (4) the trial court's refusal to give a pinpoint instruction violated Petitioner's due process rights; (5) Petitioner's rights under the Confrontation Clause were violated; (6) the trial court erred in denying Petitioner's motion to sever; (7) Petitioner's free association right was violated; (8) there was not substantial evidence to support the aiding and abetting; (9) there was insufficient evidence to convict Petitioner of conspiracy; (10) there was insufficient evidence to convict Petitioner of murder; (11) the trial court failed on its own to instruct the jury on the natural and probable consequences doctrine; (12) Petitioner's due process rights were violated because he was not given notice of the gun discharge enhancement; and (13) the trial court erred in imposing and staying an enhancement. (Petition at 5-6.) On January 26, 2007, Respondent filed an answer, admitting timeliness, but claiming that Grounds Six, Seven, and Thirteen were unexhausted. Respondent nevertheless addressed all claims on

2

the merits.[1]  On February 9, 2007, Petitioner filed a motion in which he asked to

delete Ground Thirteen and requested a stay while he exhausted Grounds Six

and Seven.  He also indicated he had filed a state habeas corpus petition with the

California Supreme Court raising Grounds Six and Seven.[2]  On February 12,

2007, the Court accepted Petitioner's abandonment of Ground Thirteen but

otherwise denied Petitioner's motion for a stay.  The Court's order indicated that if

it later determined that Grounds Six and Seven had merit, it would consider

another request to stay for exhaustion.  Petitioner filed a reply on March 2, 2007.

This matter was taken under submission and is now ready for decision.

## II.

## **STATEMENT OF FACTS**

Below are the facts set forth in the first California Court of Appeal decision

on direct review.  To the extent an evaluation of Petitioner's claims for relief

depends on an examination of the record, the Court has made an independent

evaluation of the record specific to Petitioner's claims for relief.

**1. The September 10, 2000 Canales Murder**

On the night of September 10, 2000, Sherry Canales, who was five months

pregnant, was walking down Gaviota Street in Long Beach with Joel

Herrera and Juan Baltazar, when shots were fired from a passing car.

Canales was shot in the back, and she and her unborn fetus were killed.

Baltazar and Herrera were both shot in the leg. Defendant told police he

was the driver of the car from which the shots were fired, but that he did not

fire any of the shots. He said that Damarian Halcomb was the shooter, and

that Halcomb had used a 9 millimeter gun defendant had seen at his

---

[1]  Respondent argued Ground Thirteen was moot because the Court of
Appeal had already granted relief.  (LD 8 at 31.)

[2]  The state habeas petition was denied on July 11, 2007, with a citation to
*In re Waltreus*, 62 Cal. 2d 218, 42 Cal. Rptr. 9 (1965).  *Oden (Terrell C.) on H.C.*,
2007 Cal. LEXIS 7408 (Cal. 2007).

grandmother's house at 2161 Locust Street. A live bullet recovered from defendant's car was determined to have come from the weapon used to kill Sherry Canales.

## 2. The September 13, 2000 Gamora Murder

On September 13, 2000, Rene Gamora was shot and killed while inside a house at 5565 Chestnut Street in Long Beach, California. Although there was no evidence that Mr. Gamora was a member of a gang, the house where he was killed was located in an area claimed by a Hispanic gang called the North Side Longos. Long Beach Police Officer Alex Lawrence was dispatched to the crime scene and found the front door open and the victim lying on the floor. He saw large quantities of blood and what appeared to be brain material strewn around the entrance to the house. Eleven people were in the house, all casually dressed Hispanic men and women in their twenties and thirties, none of whom spoke English.

On September 13, 2000, Maria Valle was at her aunt's house on 55th Street in Long Beach, approximately one block away from where Gamora was murdered. At approximately 11:30 p.m., she heard three gunshots. She looked out the front window, saw a car stopped in front of the house, and heard its engine running. She saw a person run towards the car from Chestnut Street and enter the back seat of the car, which then sped away. As the car was leaving, Ms. Valle and her aunt, Maria Gonzalez, wrote down its license plate number as 4MD415. Maria Gonzalez also heard gunshots that night, looked out the window, and saw a car with tinted windows stopped outside her house. She saw two people enter the car, one of them from the driver's side, and heard them say, "Let's go."

### 3. Defendant's Arrest

Shortly after midnight on October 2, 2000, Long Beach Police Officer
Robert Knight and his partner were dispatched to a house at 2165 Locust
Avenue in Long Beach. There, the officers found three shell casings on the
driveway. While waiting for a lab technician to arrive, Officer Knight
observed two black men exit the house at 2161 Locust, just south of his
location. The men walked to a small blue or purple hatchback car parked
on the street, and drove away. After looking at the car, Officer Knight
remembered receiving an earlier dispatch call concerning a suspect vehicle
that matched the description of the car he was observing. He wrote down
the license plate number of the car as 4MDY215, attempted to follow it, but
lost sight of it.

That same night, Long Beach Police Officer Mark Steenhausen received a
radio dispatch from Officer Knight concerning a car he was attempting to
follow. Officer Steenhausen saw the car traveling on Locust Avenue with its
lights out, and he and his partner, Paul Gallo, stopped the car. Defendant
was driving, and he consented to a search of the car. Officer Gallo
searched defendant's car and found a live bullet. A subsequent search of
2161 Locust Avenue yielded ammunition and several guns, including a gun
that was determined to have been used in the murder of Sherry Canales.
After a firearms expert determined that the bullet recovered from
defendant's car had been cycled through the magazine of the weapon used
to kill Sherry Canales on September 10, 2000, defendant was arrested.
After his arrest, various photographs of defendant and others were also
recovered from defendant's car. In the photographs, defendant is making
hand signs associated with a gang known as the 21st Street Insane Crips

### 3. Defendant's Statements to Police

After defendant was taken into custody, he was interviewed by Long Beach homicide detectives on November 22, 23, 24, and 27, 2000. The November 23, 24, and 27 interviews were audiotaped. During the interviews, defendant told the detectives that he owned a purple Ford Aspire. He also told the detectives about the Insane Crips gang, its members, and his involvement with the gang. Defendant said that the Insane Crips gang was warring with Hispanics and other rival gangs. He described "missions" in which Insane Crips members would shoot at their rivals, and "crews," or groups of gang members who traveled together during these shootings. Defendant admitted being associated with the Insane Crips gang, and identified Hector Miles, Damarian Halcomb, and Reginald Oden as fellow gang members who were part of his "crew." He said that his grandmother's house at 2161 Locust Avenue was a gathering place for gang members and acknowledged that guns were kept there. Defendant described one meeting that took place at his grandmother's house, during which an Insane Crips gang member told them it was time to "ride" on Mexicans, which defendant understood to mean as to kill Mexicans.

Defendant said he was the driver of the car at the September 10, 2000 shooting but did not fire any of the shots. Defendant also told detectives that on the evening of September 13, 2000, he drove to his grandmother's house and met Halcomb, Miles and Reginald Oden there. At about 8:00 p.m. two other cars arrived, and the occupants of those cars, nearly all of them Insane Crips members, got out and everyone talked. All of the men then left in three cars, and the cars traveled together in tandem. Defendant drove his own car, which was the middle car in the three-car caravan, and Halcomb and Miles rode with him. Occupants of all three cars were in communication with one another via cell phone, walkie-talkie, or pager. As

6

1  they were driving in Long Beach, an Insane Crips associate named Roc,
2  who was driving the lead car, pointed to a man walking on the street
3  wearing a baseball cap with the letter "M" on it. Roc called defendant's cell
4  phone and told him that the man in the hat was "slipping," which defendant
5  understood to mean in the wrong neighborhood. All three cars then turned
6  into a residential neighborhood on Chestnut Street and parked. The lead
7  car drove off, and Roc told defendant they were "going to get to do" the
8  man in the "M" hat, which defendant understood to mean shoot him or beat
9  him up. A few minutes later, the lead car returned, and a gang member
10 named Half-Pint exited the car and walked a short distance to Chestnut
11 Street. Defendant assumed Half-Pint was armed. Ten minutes later,
12 defendant heard two or three gunshots and saw Half-Pint run down
13 Chestnut Street with a chrome revolver in his hand. Half-Pint put the gun
14 into his waistband, got into defendant's car, and told defendant to take him
15 home. Defendant drove Half-Pint to his apartment and waited there for the
16 occupants of the other two cars to arrive. There, everyone got out of the
17 cars and started talking. Half-Pint told the group, "He's gone," and "I got
18 him. I shot him." Defendant assumed that Half-Pint had shot the man
19 wearing the "M" hat.
20 (LD 8 at 4-7.)
21                                         III.
22                        **STANDARD OF REVIEW**
23      A federal court may not grant a petition for writ of habeas corpus by a
24 person in state custody with respect to any claim that was adjudicated on the
25 merits in state court unless it (1) "resulted in a decision that was contrary to, or
26 involved an unreasonable application of, clearly established Federal law, as
27 determined by the Supreme Court of the United States"; or (2) "resulted in a
28 decision that was based on an unreasonable determination of the facts in light of

1    the evidence presented in the State court proceeding."  28 U.S.C. § 2254(d);

2    *Woodford v. Visciotti*, 537 U.S. 19, 21, 123 S. Ct. 357, 154 L. Ed. 2d 279 (2002)

3    (per curiam).

4         "'[C]learly established Federal law' . . . is the governing legal principle or

5    principles set forth by the Supreme Court at the time the state court rendered its

6    decision."  *Lockyer v. Andrade*, 538 U.S. 63, 71-72, 123 S. Ct. 1166, 155 L. Ed.

7    2d 144 (2003).  A state court's decision is "contrary to" clearly established

8    Federal law if (1) it applies a rule that contradicts governing Supreme Court law;

9    or (2) it "confronts a set of facts . . . materially indistinguishable" from a decision

10   of the Supreme Court but reaches a different result.  *Early v. Packer*, 537 U.S. 3,

11   8, 123 S. Ct. 362, 154 L. Ed. 2d 263 (2002).  A state court's decision cannot be

12   contrary to clearly established Federal law if there is a "lack of holdings from" the

13   Supreme Court on a particular issue.  *Carey v. Musladin*, 127 S. Ct. 649, 654,

14   166 L. Ed. 2d 482 (2006).

15        Under the "unreasonable application" prong of section 2254(d)(1), a federal

16   court may grant habeas relief "based on the application of a governing legal

17   principle to a set of facts different from those of the case in which the principle

18   was announced."  *Lockyer*, 538 U.S. at 76; *see also Woodford*, 537 U.S. at 24-26

19   (state court decision "involves an unreasonable application" of clearly established

20   federal law if it identifies the correct governing Supreme Court law but

21   unreasonably applies the law to the facts).

22        A state court's decision "involves an unreasonable application of [Supreme

23   Court] precedent if the state court either unreasonably extends a legal principle . .

24   . to a new context where it should not apply, or unreasonably refuses to extend

25   that principle to a new context where it should apply."  *Williams v. Taylor*, 529

26   U.S. 362, 407, 120 S. Ct. 1495, 146 L. Ed. 2d 389 (2000).

27        "In order for a federal court to find a state court's application of [Supreme

28   Court] precedent 'unreasonable,' the state court's decision must have been more

8

than incorrect or erroneous." *Wiggins v. Smith*, 539 U.S. 510, 520-21, 123 S. Ct. 2527, 156 L. Ed. 2d 471 (2003) (citation omitted). "The state court's application must have been 'objectively unreasonable.'" *Id.* (citation omitted); *see also Clark v. Murphy*, 331 F.3d 1062, 1068 (9th Cir.), *cert. denied*, 540 U.S. 968 (2003).

"Factual determinations by state courts are presumed correct absent clear and convincing evidence to the contrary, § 2254(e)(1), and a decision adjudicated on the merits in a state court and based on a factual determination will not be overturned on factual grounds unless objectively unreasonable in light of the evidence presented in the state-court proceeding, § 2254(d)(2)." *Miller-El v. Cockrell*, 537 U.S. 322, 340, 123 S. Ct. 1029, 154 L. Ed. 2d 931 (2003); *see also Mitleider v. Hall*, 391 F.3d 1039, 1046 (9th Cir. 2004), *cert. denied*, 545 U.S. 1143 (2005).

In applying these standards, this Court looks to the last reasoned state court decision. *Davis v. Grigas*, 443 F.3d 1155, 1158 (9th Cir. 2006). To the extent no such reasoned opinion exists, as when a state court rejected a claim in an unreasoned order, this Court must conduct an independent review to determine whether the decisions were contrary to, or involved an unreasonable application of, "clearly established" Supreme Court precedent. *Delgado v. Lewis*, 223 F.3d 976, 982 (9th Cir. 2000). If the state court declined to decide a federal constitutional claim on the merits, this Court must consider that claim under a *de novo* standard of review rather than the more deferential "independent review" of unexplained decisions on the merits authorized by *Delgado*. *Lewis v. Mayle*, 391 F.3d 989, 996 (9th Cir. 2004) (standard of *de novo* review applicable to claim state court did not reach on the merits).

## IV.

## DISCUSSION

**A.    GROUND ONE: Failure to Strike Juvenile Adjudication**

A claim involving only the application and/or interpretation of California law

1    is not cognizable on federal habeas review. *See* 28 U.S.C. § 2254(a);  *Bradshaw*

2    *v. Richey*, 546 U.S. 74, 76, 126 S. Ct. 602, 163 L. Ed. 2d 407 (2005) (per curiam)

3    ("[A] state court's interpretation of state law, including one announced on direct

4    appeal of the challenged conviction, binds a federal court sitting in habeas

5    corpus."); *Estelle v. McGuire*, 502 U.S. 62, 67-68, 112 S. Ct. 475, 116 L. Ed. 2d

6    385 (1991) ("it is not the province of a federal habeas court to reexamine

7    state-court determinations on state-law questions"); *Smith v. Phillips*, 455 U.S.

8    209, 221, 102 S. Ct. 940, 71 L. Ed. 2d 78 (1982) ("Federal courts hold no

9    supervisory authority over state judicial proceedings and may intervene only to

10   correct wrongs of constitutional dimension."); *Langford v. Day*, 110 F.3d 1380,

11   1389 (9th Cir.) ("We accept a state court's interpretation of state law, . . . and

12   alleged errors in the application of state law are not cognizable in federal habeas

13   corpus."), *cert. denied*, 522 U.S. 881 (1997).

14        Petitioner argues that his prior juvenile adjudication of second degree

15   robbery should not have constituted a strike because robbery was not listed

16   under California Welfare and Institution Code § 707(b) at the time he was

17   adjudged a ward of the juvenile court.  (Reply at Ground 1.)  Respondent

18   contends that this ground is not cognizable on federal habeas because it is purely

19   a state-law claim.

20        Whether Petitioner's prior juvenile adjudication qualifies as a strike for

21   purposes of sentencing is a question of California sentencing law.  *See Miller v.*

22   *Vasquez*, 868 F.2d 1116, 1118-19 (9th Cir. 1989).  The Court of Appeal held that

23   Petitioner's argument was incorrect under California law.  (LD 8 at 7-10.)

24   Petitioner has not shown any error.  Even assuming error, "[a]bsent a showing of

25   fundamental unfairness, a state court's misapplication of its own sentencing laws

26   does not justify federal habeas relief." *Christian v. Rhode*, 41 F.3d 461, 469 (9th

27   Cir. 1994).  There is no fundamental unfairness here.

28

1   Petitioner's claim fails because it is not cognizable under federal habeas

2   corpus.

3   **B.    GROUNDS TWO AND THREE:  Prior Juvenile Adjudication as**

4        **Constitutional Violation**

5   A judge cannot "impose a sentence above the statutory maximum based

6   on a fact, other than a prior conviction, not found by a jury or admitted by the

7   defendant." *Cunningham v. California*, 127 S. Ct. 856, 860, 166 L. Ed. 2d 856

8   (2007); *United States v. Booker*, 543 U.S. 220, 244, 125 S. Ct. 738, 160 L. Ed. 2d

9   621 (2005); *Blakely v. Washington*, 542 U.S. 296, 301, 124 S. Ct. 2531, 159 L.

10  Ed. 2d 403 (2004), citing to *Apprendi v. New Jersey*, 530 U.S. 466, 490, 120 S.

11  Ct. 2348, 147 L. Ed. 2d 435 (2000).

12  In *United States v. Tighe*, 266 F.3d 1187 (9th Cir. 2001), the defendant

13  pled guilty to various federal crimes.  His sentence was enhanced under the

14  Armed Career Criminal Act, in part based on a nonjury juvenile adjudication in

15  Oregon. *Id.* at 1191.  Based on the reasoning in *Apprendi* and *Jones v. United*

16  *States*, 526 U.S. 227, 119 S. Ct. 1215, 143 L. Ed. 2d 311 (1999), *Tighe* held that

17  the "prior conviction exception to *Apprendi*'s general rule must be limited to prior

18  convictions that were themselves obtained through proceedings that included the

19  right to a jury trial and proof beyond a reasonable doubt." *Id.* at 1194.

20  In *Boyd v. Newland*, 467 F.3d 1139 (9th Cir. 2006), *cert. denied*, 127 S. Ct.

21  2249 (2007), a case decided after the California Court of Appeal's decision in

22  Petitioner's case, the petitioner argued that the California courts had erred in

23  enhancing his sentence based on a nonjury juvenile adjudication.  *Boyd* noted

24  that California courts disagreed with *Tighe*. *Id.* at 1152.  In addition, the Third,

25  Eighth, and Eleventh Circuits have held that nonjury juvenile adjudications *can* be

26  constitutionally used to enhance a defendant's sentence. *Id.*  Without

27  "suggesting that *Tighe* was incorrectly decided," *Boyd* stated that *Tighe* did "not

28  represent clearly established federal law 'as determined by the Supreme court of

1   the United States." *Id.* (quoting 28 U.S.C. § 2254(d)(1)).  As *Boyd* pointed out,

2   "Ninth Circuit precedent remains persuasive authority in determining what is

3   clearly established federal law" (*id.* (citing to *Duhaime v. Ducharme*, 200 F.3d

4   597, 600-01 (9th Cir. 1999), "[b]ut, in the face of authority that is directly contrary

5   to *Tighe*, and in the absence of explicit direction from the Supreme Court, we

6   cannot hold that the California courts' use of Petitioner's juvenile adjudication as

7   a sentencing enhancement was contrary to, or involved an unreasonable

8   application of, Supreme Court precedent." *Id.*

9        In Ground Two, Petitioner argues that under *Tighe* and *Apprendi*, the use

10   of a nonjury juvenile adjudication as a prior conviction is unconstitutional.  In

11   Ground Three, Petitioner asks this Court to adopt the reasoning in Associate

12   Justice Earl Johnson, Jr.'s dissent in *People v. Smith*, 110 Cal. App. 4th 1072, 1

13   Cal. Rptr. 3d 901 (2003).

14        The California Court of Appeal's decision, which is the last reasoned

15   decision under *Davis*, was not an unreasonable application of United States

16   Supreme Court precedent.  The court distinguished *Tighe* because in California a

17   juvenile adjudication must be proved beyond a reasonable doubt and a defendant

18   with a juvenile adjudication has the right to a jury trial on whether he "suffered a

19   prior conviction." (LD 8 at 10.) "These procedural safeguards satisfy the due

20   process concerns expressed in *Apprendi*." (*Id.*) The California court also

21   rejected Petitioner's invocation of the Johnson dissent, reasoning that it was

22   bound by the California Supreme Court in *In re Daedler*, 194 Cal. 320 (1924),

23   which held there is no right to a jury trial in juvenile proceedings, as well as the

24   United States Supreme Court's decision in *McKeiver v. Pennsylvania*, 403 U.S.

25   528, 91 S. Ct. 1976, 29 L. Ed. 2d 647 (1971), which held the same.

26        Based on *Boyd*, this Court cannot say that the state court decision here

27   was unreasonable.  *See also Carey*, 127 S. Ct. at 654 ("A state court's decision

28

12

1  cannot be contrary to clearly established Federal law if there is a 'lack of holdings

2  from' the Supreme Court on a particular issue.")

3       Petitioner's claims fail.

4       **C.    GROUNDS FOUR AND ELEVEN: <u>Failure to Give Jury</u>**

5                **<u>Instructions</u>**

6       "The only question . . . is 'whether [a jury] instruction by itself so infected

7  the entire trial that the resulting conviction violates due process." *Estelle v.*

8  *McGuire*, 502 U.S. 62, 72, 112 S. Ct. 475, 116 L. Ed. 2d 385 (1991) (quoting

9  *Cupp v. Naughten*, 414 U.S. 141, 147, 94 S. Ct. 396, 38 L. Ed. 2d 368 (1973)).

10  "[I]t must be established not merely that the instruction is undesirable, erroneous,

11  or even 'universally condemned,' but that it violated some [constitutional] right.'"

12  *Donnelly v. DeChristoforo*, 416 U.S. 637, 643, 94 S. Ct. 1868, 40 L. Ed. 2d 431

13  (1974). "[T]he degree of prejudice resulting from instruction error be evaluated in

14  the total context of the events at trial." United States v. Frady, 456 U.S. 152, 169,

15  102 S. Ct. 1584, 71 L. Ed. 2d 816 (1982). "[W]e also bear in mind . . . that we

16  'have defined the category of infractions that violate "fundamental fairness" very

17  narrowly.'" *Estelle*, 502 U.S. at 72-73 (quoting *Dowling v. United States*, 493 U.S.

18  342, 352, 110 S. Ct. 668, 107 L. Ed. 2d 708 (1990)). Here, Petitioner's "burden is

19  especially heavy" because "[a]n omission, or an incomplete instruction, is less

20  likely to be prejudicial than a misstatement of the law." *Henderson v. Kibbe*, 431

21  U.S. 145, 155, 97 S. Ct. 1730, 52 L. Ed. 2d 203 (1977).

22       **1.    Ground Four - Failure to Give Pinpoint Instruction**

23       Petitioner asked the trial court to give the following instruction:

24       Membership in a gang cannot serve as proof of intent or of the

25       facilitation, advice, aid, promotion, encouragement or instigation

26       needed to establish aiding and abetting.

27  (LD 3 at 1829.) Petitioner argues that the instruction was required under *Mitchell*

28  *v. Prunty*, 107 F.3d 1337, 1342 (9th Cir.), *cert. denied sub nom. Ayers v. Mitchell*,

1   522 U.S. 913 (1997), *overruled on other grounds by Santamaria v. Horsley*, 133

2   F.3d 1242, 1248 (9th Cir. 1998) (en banc).

3        According to the California Court of Appeal, *Mitchell* involved sufficiency of

4   the evidence, not instructional error.  (LD 8 at 12.)  In addition, the part of the

5   instruction about intent is contrary to California law.  (*Id.*)  In any event, even if the

6   trial court's refusal was error, it was harmless because other instructions

7   adequately directed "the jury concerning defendant's liability as an aider and

8   abettor of a crime."  (*Id.* at 12-13.)

9        The Court agrees that any error was harmless.  As the state court

10  explained, other jury instructions mitigated any possible harm caused by the

11  omitted instruction.  *See Henderson*, 431 U.S. at 156 ("The significance of the

12  omission of such an instruction may be evaluated by comparison with the

13  instructions that were given."); *see also Spivey v. Rocha*, 194 F.3d 971, 976 (9th

14  Cir. 1999) ("The instruction must be viewed in the context of the entire trial and

15  the jury instructions taken as a whole.  The relevant inquiry is 'whether there is a

16  reasonable likelihood that the jury has applied the challenged instruction' in an

17  unconstitutional manner.") (quoting *Boyde v. California*, 494 U.S. 370, 380, 110

18  S. Ct. 1190, 108 L. Ed. 2d 316 (1990)), *cert. denied*, 531 U.S. 995 (2000).

19       As the state court explained, the jury was given the following instructions:

20       (1)  "Mere presence at the scene of a crime which does not itself assist the

21  commission of the crime does not amount to aiding and abetting."  (LD 1 at 608.)

22       (2)  "Mere knowledge that a crime is being committed and the failure to

23  prevent it does not amount to aiding and abetting."  (*Id.*)

24       (3)  "Evidence that a person was in the company of or associated with one

25  or more other persons alleged or proved to have been members of a conspiracy

26  is not, in itself, sufficient to prove that person was a member of the alleged

27  conspiracy."  (*Id.* at 614.)

28

1   (LD 8 at 12.)  All three instructions highlight the fact that Petitioner could not be

2   convicted by mere association.

3        In addition to the instructions cited by the state court, the jury was

4   instructed to "[c]onsider the instructions as a whole." (LD 1 at 582.)  The jury was

5   also instructed that "a person or persons other than a defendant was or may have

6   been involved in the crimes for which the defendant is on trial" but that the jury's

7   "duty is to decide whether the People have proved the guilty of the defendant on

8   trial." (*Id.* at 591.)

9        Petitioner offers no support other than conclusory speculation for his

10  contention that the outcome would have been different had the instruction been

11  given:  "[S]ince gang membership alone is (insufficient) to establish aiding and

12  abetting, instruction on that subject could well have assisted the jury in

13  concluding that the prosecution failed to establish aiding and abetting by means

14  of evidence other than mere gang affiliation." (Reply at Ground Four); *see*

15  *Henderson*, 431 U.S. at 157 ("Even if we were to make the unlikely assumption

16  that the jury might have reached a different verdict pursuant to an additional

17  instruction, that possibility is too speculative to justify the conclusion that

18  constitutional error was committed.").  Unlike Mitchell, there is sufficient evidence

19  to support a conviction for aiding and abetting, as discussed under Ground Eight.

20       Petitioner's claim fails.

21       **2.     Ground Eleven - Failure to Give Instruction on the Natural**

22  **and Probable Consequences Doctrine**

23       The jury was given the following two instructions related to the conspiracy

24  charge:

25       Each member of a conspiracy is liable for each act and bound by

26       each declaration of every other member of the conspiracy if that act

27       or declaration is in furtherance of the object of the conspiracy.  [¶]

28

1          The act of one conspirator pursuant to or in furtherance of the

2          common design of the conspiracy is the act of all conspirators.

3   (LD 1 at 612 (Modified CALJIC 6.11).)

4          Where a conspirator commits an act or makes a declaration which is

5          neither in furtherance of the object of the conspiracy nor the natural

6          and probable consequence of an attempt to attain that object, he

7          alone is responsible for and is bound by that act or declaration, and

8          no criminal responsibility therefor attaches to any of his

9          confederates.

10  (*Id.* at 616 (CALJIC 6.16).)

11         Petitioner argues that the trial court erred by not instructing the jury on the

12  definition of the natural and probable consequence doctrine:

13         A member of a conspiracy is not only guilty of the particular crime

14         that to his knowledge his confederates agreed to and did commit, but

15         is also liable for the natural and probable consequence of any [crime]

16         [act] of a co-conspirator to further the object of the conspiracy, even

17         though that [crime] [act] was not intended as a part of the agreed

18         upon objective and though he was not present at the time of the

19         commission of that [crime] [act].  [¶]  You must determine whether

20         the defendant is guilty as a member of a conspiracy to commit the

21         originally agreed upon crime or crimes, and, if so, whether the crime

22         alleged . . . was perpetrated by a co-conspirator in furtherance of that

23         conspiracy and was a natural and probable consequence of the

24         agreed upon criminal objective of that conspiracy.  [¶]  In determining

25         whether a consequence is "natural and probable" you must apply an

26         objective test based not on what the defendant actually intended but

27         on what a person of reasonable and ordinary prudence would have

28         expected would be likely to occur.  The issue is to be decided in light

16

1  of all the circumstances surrounding the incident.  A "natural

2  consequence" is one which is within the normal range of outcomes

3  that may be reasonable expected to occur if nothing unusual has

4  intervened.  "Probable" means likely to happen.

5  (LD 8 at 24 (Unmodified CALJIC 6.11).)

6  According to Petitioner, the murder of Gamora was not a natural and

7  probable consequence of the agreement.  Petitioner argues the objective was to

8  shoot the man wearing a hat with an M on it, which was not Gamora.  Half Pint

9  couldn't find the man in the M hat and shot Gamora instead.  (Reply at Ground

10  Eleven.)

11  The California Court of Appeal found that even if the trial court erred,

12  Petitioner was not prejudiced.  (LD 8 at 25.)    The object of the conspiracy "was

13  the murder of a rival gang member, not a man wearing an 'M' hat."  Petitioner

14  was a gang member, he was with fellow gang members on the night of the

15  murder.  The murder took place in an area claimed by Petitioner's rival gang, and

16  Gamora was Hispanic.  His killing involved the same kind of injury designed or

17  contemplated by the conspiracy.  (*Id.* at 25-26.)

18  The state court's determination was not unreasonable.  The record

19  contained evidence that Petitioner and others were told at a meeting "that it's time

20  to ride on these Mexicans," which meant "time to go killing Mexicans."  (LD 1 at

21  716.)  On September 13, 2000, a fellow gang member pointed out a man with an

22  M hat.  (*Id.* at 772.)  However, Petitioner described an M hat as a "Mexican hat,"

23  as a "baseball cap."  (*Id.* at 772, 782.)  He did not describe it as a hat with an "M"

24  on it.  Petitioner is correct, as the Court of Appeal acknowledged, that Gamora

25  was not a gang member, but under California law,[3] his killing was still "'the same

26  ─────────────────

27  [3] Respondent argues that this ground does not present a federal question suitable for federal habeas review because Petitioner presented it as a pure state law issue.  (Answer at 7; *see* LD 5 at 60-66.)  Petitioner's one federal citation,

28  *United States v. Andrews*, 75 F.3d 552 (9th Cir.), *cert. denied*, 517 U.S. 1239

1   kind of injury or harm as that designed or contemplated' and was 'not too remote

2   or accidental in its occurrence' to relieve defendant of co-conspirator liability."

3   (LD 8 at 25-26.)

4       Petitioner's claim fails.

5   **D.    GROUND FIVE: <u>Confrontation Clause</u>**

6       In *Crawford v. Washington*, 541 U.S. 36, 61, 124 S. Ct. 1354, 158 L. Ed. 2d

7   177 (2004), the Supreme Court held that under the Confrontation Clause of the

8   Sixth Amendment, testimonial, out-of-court statements are inadmissible in a

9   criminal proceeding unless the witness was unavailable to testify and the

10  defendant had a prior opportunity for cross-examination.  Only testimonial

11  statements are subject to exclusion under the Confrontation Clause; "[w]here

12  nontestimonial hearsay is at issue, it is wholly consistent with the Framers' design

13  to afford the States flexibility in their development of hearsay law." *Id.* at 68; *see*

14  *also Davis v. Washington*, 126 S. Ct. 2266, 2273, 165 L. Ed. 2d 224 (2006)

15  ("Only [testimonial] statements . . . cause the declarant to be a 'witness' within the

16  meaning of the Confrontation Clause").

17      **1.    Trial Court Proceeding**

18      Officer Knight of the Long Beach Police Department testified at trial that

19  when he was dispatched to a residence on October 2, 2000, he noticed three

20  _____

21  (1996), is inapposite.  In *Andrews*, Ivan and his sister Paula got into a fight with

22  Lowery.  They went away and then went back to "get" Lowery.  *Id.* at 554.  When
    they arrived back at the scene, Ivan shot Lowery.  Nonetheless, Paula shot inside

23  Lowery's truck, killing one person and injuring two others.  *Id.*  The court found
    that Ivan did not have the requisite intent to kill this other person under the natural

24  and probable consequences doctrine because "Paula did not shoot the victims in
    the car in the course of getting Lowery; she acted impulsively and on her own."

25  *Id.* at 556.  Ivan's and Paula's actions are distinguishable from those of Half Pint
    and Petitioner.  Half Pint didn't kill two people.  He killed one.  The jury found that

26  Petitioner conspired to kill a person.  Even assuming that Half Pint killed a
    different person from the one discussed, it doesn't follow that given all the events

27  leading up to the killing, it wasn't foreseeable that Half Pint would kill someone.
    The killing of Gamora was a consequence that was "within the normal range of

28  outcomes that may be reasonably expected to occur." (Unmodified CALJIC
    6.11.)

1  shell casings in the driveway.  (LD 3 at 624.)  While waiting for lab technicians to

2  arrive at the scene, Knight saw two Black males walk to a car parked on the

3  street.  (*Id.*)  The following was then reported:

4      Q.  What did you do?

5      A.  I was actually sitting in my car at the time.  I just noticed them

6      walking to their car, and they got into it.  As soon as they pulled away

7      and drove past me, I remembered earlier information that was

8      dispatched via radio patrol radio that the suspect vehicle --

9      DEFENSE COUNSEL:  Objection.  Hearsay.

10      COURT:  It depends.  Is this being offered to show why he did what

11      he did subsequently?

12      PROSECUTOR:  I'm not sure.  That's in dispute, actually.  But it is,

13      yes.

14      COURT:  Then it's not hearsay.

15      WITNESS:  After looking at the car, I remembered a possible

16      suspect vehicle on an earlier incident, homicide incident, where the

17      suspect vehicle might have been a small purple or blue hatchback.

18      [¶]  As it drove southbound past me, from the area of this shooting, I

19      felt that may have been involved.  So I read the plate, put out the

20      information, and then attempted to turn around and followed the

21      vehicle and eventually conducted a traffic stop on it, but I lost it.

22  (LD 3 at 626-27.)

23          **2.**  **Discussion**

24        Petitioner contends that the admission of the substance of the radio

25  dispatch call through Knight violated the Confrontation Clause.  (Petition at

26  Ground 5.)  In his reply, Petitioner concedes that the dispatcher statements were

27  not testimonial.  (Reply at Ground Five.)  Nonetheless, Petitioner argues that

28  admission of the evidence violated the Confrontation Clause under *Ohio v.*

1  *Roberts*, 448 U.S. 56, 66, 100 S. Ct. 2531, 65 L. Ed. 2d 597 (1980), which held

2  that "an unavailable witness's out-of-court statement may be admitted so long as

3  it has adequate indicate of reliability, i.e., falls within a "firmly rooted hearsay

4  exception" or bears "particularized guarantees of trustworthiness."

5  　　　　Until recently, it was unclear to what extent, if any, *Roberts* was still viable

6  after *Crawford*.  Certainly, *Roberts* had no viability for testimonial statements after

7  *Crawford*.  *See Crawford*, 541 U.S. at 68 ("Where testimonial evidence is at issue

8  . . . the Sixth Amendment demands what the common law required:  unavailability

9  and a prior opportunity for cross-examination").  In *Whorton v. Bocking*, 127 S. Ct.

10  1173, 167 L. Ed. 2d 1 (2007), the Supreme Court clarified that *Crawford*

11  "eliminat[es] . . . Confrontation Clause protection against the admission of

12  unreliable out-of-court nontestimonial statements" and that "the Confrontation

13  Clause has no application to such statements and therefore permits their

14  admission even if they lack indicia of reliability."  *Id.* at 1183; *see also United*

15  *States v. Larson*, 2007 WL 2192256, *17 n.4 (9th Cir. 2007).

16  　　　　Thus, because Petitioner acknowledges that the out-of-court statements

17  here are nontestimonial, his contention that *Roberts* applies to their admissibility

18  is contradicted by *Whorton*, and his claim fails.[4]

19  　　**E.**　　**GROUND SIX: Severance**

20  　　　　"Improper joinder does not, in itself, violate the Constitution.  Rather,

21  misjoinder would rise to the level of a constitutional violation only if it results in

22  prejudice so great as to deny a defendant his Fifth Amendment right to a fair

24  　　　[4] Moreover, any error would be harmless under *Brecht* for the reasons
25  stated in the Court of Appeal's opinion.  (LD 8 at 14.)  The Court need not
consider Respondent's argument that this ground is procedurally barred because
26  Petitioner failed to object at trial that the testimony violated the Confrontation
Clause.  *See Franklin v. Johnson*, 290 F.3d 1223, 1232 (9th Cir. 2002) (a court
27  may proceed to the merits if the procedural bar issue is more complex); *see also*
*Lambrix v. Singletary*, 520 U.S. 518, 525, 117 S. Ct. 1517, 137 L. Ed. 2d 771
28  (1997) ( a *Teague* issue may be resolved before a procedural bar issue if the
procedural bar "involved complicated issues of state law").

1  trial." *United States v. Lane*, 474 U.S. 438, 446 n.8, 106 S. Ct. 725, 88 L. Ed. 2d

2  814 (1986). A petitioner has the burden of proving "unfairness rising to the level

3  of a due process concern." *Park v. California*, 202 F.3d 1146, 1149 (9th Cir.),

4  *cert. denied*, 531 U.S. 918 (2000).

5      A trial court has broad discretion in ruling on severance motions. *Herd v.*

6  *Kincheloe*, 800 F.2d 1526, 1529 (9th Cir.1986). The relevant factors are judicial

7  economy and prejudice. *United States v. Lewis*, 787 F.2d 1318, 1320 n.3 (9th

8  Cir. 1986), *cert. denied*, 489 U.S. 1032 (1989). A reviewing court must consider

9  (1) whether strong evidence of one count is presented with relatively weak

10 evidence on another count; (2) whether the evidence of the other count is

11 cross-admissible; and (3) whether the state trial court admonished the jury as to

12 the limited use of the other crimes evidence. *See Bean v. Calderon*, 163 F.3d

13 1073, 1084-86 (9th Cir.1998), *cert. denied*, 528 U.S. 922 (1999). Even if the

14 evidence is not cross-admissible, joinder generally does not result in prejudice if

15 the evidence of each crime is simple and distinct and the jury is properly

16 instructed so it may compartmentalize the evidence. *Lane*, 474 U.S. at 450;

17 *Bean*, 163 F.3d at 1085-86; *see also United States v. Johnson*, 820 F.2d 1065,

18 1071 (9th Cir.1987). "[T]he failure of the jury to convict on all counts is the best

19 evidence of the jury's ability to compartmentalize the evidence." *Park*, 202 F.3d

20 at 1150 (citations and internal quotation marks omitted).

21      Petitioner contends that the state trial court erred in denying his motion to

22 sever the counts related to the September 10 shooting (victim Canales) from

23 those related to the September 13 shooting (victim Gamora). (Petition at Ground

24 Six.) Respondent correctly argues that this ground is unexhausted because

25 Petitioner failed to raise it to the California Supreme Court. (*See* LD 9.)

26 However, this claim may be denied on the merits as it is "perfectly clear" that it

27 raises no colorable federal claim. *Cassett v. Stewart* , 406 F.3d 614, 624 (9th Cir.

28 2005), *cert. denied sub nom. Schriro v. Cassett*, 126 S. Ct. 1336 (2006).

Petitioner's argument that the prosecution's "case" was weak because the jury rejected so many of the charged overt acts cuts against Petitioner as it shows clearly that the jury was able to "compartmentalize the evidence." (Reply at Ground Six; LD 1 at 846-47.); *Lane*, 474 U.S. at 450.

Moreover, the potential for prejudice normally exists when there is a danger that evidence in the stronger count will spill over and unfairly strengthen the weaker count.[5] That did not happen here. The jury did not convict Petitioner on the weaker Canales counts. Petitioner's argument that the weaker evidence influenced the jury's evaluation of the stronger Gamora counts is unsupported. (Reply at Ground Six(2).)

Petitioner's claim fails.

**F.    GROUND SEVEN: Equal Protection**

The Fourteenth Amendment's equal protection clause mandates that "all persons similarly situated should be treated alike." *Tennessee v. Lane*, 541 U.S. 509, 522, 124 S. Ct. 1978, 158 L. Ed. 2d 820 (2004). A litigant must allege he was similarly situated to others who received preferential treatment (*Cleburne v. Cleburne Living Center*, 473 U.S. 432, 439, 105 S. Ct. 3249, 87 L. Ed. 2d 313 (1985)), and there was discriminatory motive or intent. *Hernandez v. New York*, 500 U.S. 352, 362, 111 S. Ct. 1859, 114 L. Ed. 2d 395 (1991); *McLean v. Crabtree*, 173 F.3d 1176, 1185 (9th Cir. 1999), *cert. denied*, 528 U.S. 1086 (2000). "Generally, legislation is presumed to pass constitutional muster . . . if the classification drawn by the statute or ordinance is rationally related to a legitimate state interest." *Nunez by Nunez v. City of San Diego*, 114 F.3d 935, 944 (9th Cir. 1997); *Cleburne*, 473 U.S. at 439-40.

Petitioner argues that Cal. Penal Code § 12022.53(e)(1) violates equal

---

[5] In *Bean*, the court found that the joinder deprived the petition of a fair trial because the evidence of the stronger case "allowed the jury to rely upon the Schatz evidence to strengthen the otherwise weak case against him for the Fox offenses." *Bean*, 163 F.3d at 1083.

protection by imposing greater penalties for gang aiders and abettors than for non-gang aiders and abettors.[6] (Reply at Ground 7.)  The California Court of Appeal's decision, which is the last reasoned decision under *Davis*, was not an unreasonable application of United States Supreme Court precedent.  According to the Court of Appeal, the two groups are not similarly situated.  The non-gang aiders and abettors "encouraged the commission of a target offense resulting in a murder," whereas the gang aiders and abettors "committed their crime with the purpose of promoting and furthering their street gang in its criminal conduct."  (LD 8 at 17.)

There is no basis to disturb the state court's factual finding.  *See Miller-El*, 537 U.S. at 340.  Nor has Petitioner presented any evidence, let alone clear and convincing evidence, that the state court's determination was objectively unreasonable.  *Id.*  In fact, Petitioner does not even address the state court's conclusion that the two groups are not similarly situated.  (Reply at Ground Seven.)

Petitioner's claim fails.

## G.     GROUNDS EIGHT AND TEN:  Insufficiency of Evidence

"[T]he Due Process Clause protects the accused against conviction except upon proof beyond a reasonable doubt of every fact necessary to constitute the crime with which he is charged."  *In re Winship*, 397 U.S. 358, 364, 90 S. Ct. 1068, 25 L. Ed. 2d 368 (1970).  "[T]he critical inquiry on review of the sufficiency of the evidence to support a criminal conviction must be . . . to determine whether

---

[6]  In state court, Petitioner argued an equal protection violation.  (LD 5 at 41; LD 9 at 13.)  In his petition here Petitioner appeared to argue a freedom of association violation.  (Petition at Ground Seven.)  Respondent argued that the claim was unexhausted because a freedom of association violation had not been presented to the state courts.  (Answer at 9.)  In his reply, Petitioner reverted back to an equal protection claim without any mention of a freedom of association violation.  (Reply at Ground Seven.)  The Court will assume that Petitioner has effectively abandoned his unexhausted freedom of association claim and address only his exhausted equal protection claim.

1  the record evidence could reasonably support a finding of guilt beyond a

2  reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 318, 99 S. Ct. 2781, 61 L.

3  Ed 2d 560 (1979).  This inquiry does not require a court to "ask itself whether it

4  believes that the evidence at the trial established guilt beyond a reasonable

5  doubt" [but] whether, after viewing the evidence in the light most favorable to the

6  prosecution, any rational trier of fact could have found the essential elements of

7  the crime beyond a reasonable doubt." *Id.* at 318-19 (citations omitted).  A

8  reviewing court must give "full play to the responsibility of the trier of fact fairly to

9  resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable

10  inferences from basic facts to ultimate facts." *Id.* at 319.

11        The California Court of Appeal decision on direct review, which was the last

12  reasoned decision under *Davis*, used the correct legal standard, whether after

13  "review[ing] the entire record in the light most favorable to the prosecution . . a

14  rational trier of fact could find the defendant guilty beyond a reasonable doubt."

15  (LD 8 at 18.)

16        The next step in the inquiry is to examine "the elements of the criminal

17  offense as set forth by state law." *Juan H. v. Allen*, 408 F.3d 1262, 1275 (9th Cir.

18  2005), *cert. denied*, 126 S. Ct. 1142 and 126 S. Ct. 1145 (2006).

19                    **1.    Ground Eight - Aiding and Abetting a Murder**

20        For Petitioner to be guilty of aiding and abetting, the following has to be

21  proven beyond a reasonable doubt:  (1) he must have acted with knowledge of

22  the criminal purpose of the perpetrator; (2) he must have had the intent or

23  purpose of committing, encouraging, or facilitating the commission of the murder;

24  and (3) he must have intended to encourage or bring about the murder, but he

25  need not have had the specific intent required of the perpetrator.  (LD 8 at 18.)

26        Petitioner argues that there was insufficient evidence that he "had

27  knowledge of Half-Pint's intent to kill and acted for the purpose of aiding or

28  facilitating acts pursuant to that intent." (Reply at Ground 8 (2).)  Petitioner

24

1   argues that his role was "limited to waiting while Half Pint got out of his car to

2   shoot a gang rival and waiting while Half Pint got in [Petitioner's] car and

3   [Petitioner] drove him home." (*Id.*) According to Petitioner, this restricted role is

4   confirmed by the jury's findings on the conspiracy charge.

5       According to the California Court of Appeal, the following evidence

6   supported the jury's verdict of guilty:

7       [D]efendant's gang, the Insane Crips, was at war with a rival Hispanic

8       gang.[7] There was also evidence that before the Gamora murder, defendant

9       attended a meeting with other Insane Crips gang members and was told

10      they needed to start "riding the Mexicans," a phrase which defendant

11      understood to mean "time to go killing Mexicans."[8] On September 13,

12      2000, defendant and other gang members met at defendant's

13      grandmother's house, where defendant knew guns were kept.[9] Defendant

14      and the other gang members left the house in a caravan of three cars and

15      drove in tandem to a Chestnut Street neighborhood. Defendant was one of

16

17

18

---

19      [7] Officer Hunt, who testified as an expert witness on gangs, testified that
20   the Insane Crips's biggest rival at the time of the murder were the East Side
     Longos, a Hispanic gang. (LD 3 at 1610-11.)

21      [8] Officer Prell testified that Petitioner went to his grandmother's house and
22   met with other Insane Crip gang members. (LD 3 at 1260-62.) Officer Hunt
     testified that at the meeting one of the gang members said "that it was time to go
23   riding on Mexicans." (*Id.* at 1597-98.) On November 27, 2000, Detectives
     McGuire and Conant interviewed Petitioner. (*Id.* at 936.) A tape and transcript
24   were made of that interview and admitted into evidence. (*Id.* at 937, 1877-78; LD
     1 at 719-742 (transcript).) In the context of a police question about shootings,
25   Petitioner stated that the Insane Crip gang members wanted "to start . . . riding
     the Mexicans." (LD 1 at 733.)

26      [9] On November 24, 2000, Officers Prell and Lasiter interviewed Petitioner.
27   (LD 3 at 1250.) A tape and transcript were made of that interview and admitted
     into evidence. (*Id.* at 1299-1300, 1877-78; (LD 1 at 744-820 (transcript).)
28   Petitioner stated that guns were kept at his grandmother's house. (LD 1 at 760-
     61.)

the drivers.[10] Defendant and the occupants of the other two cars were in communication with each other via cell phones, pagers, and walkie-talkies.[11] When an occupant of the lead car pointed out a man wearing a hat, all three cars pulled over, and Half Pint exited one of the cars. Defendant used his cell phone to call a gang member in the lead car to ask what Half-Pint was doing, he was told that Half-Pint was going to shoot the man in the hat.[12] Defendant assumed that Half-Pint was armed when he left the car, and defendant waited in his car with the others until Half-Pint returned.[13] Defendant heard gunshots and saw Half-Pint running down Chestnut Street with a revolver.[14] Half-Pint got into defendant's car and directed defendant to drive him home. Defendant did so.[15] There, defendant waited for the occupants of the other two cars to arrive. When

---

[10]  Petitioner told police that three cars drove together from his grandmother's house to the other area, and that Petitioner was one of the drivers. (LD 1 at 762-63.)

[11]  Petitioner told police that the car occupants were in communication with each other by phone, pager, and walkie-talkie. (LD 3 at 768-72.)

[12]  Petitioner told police that after they saw the male in an "M Hat" (Mexican hat), the three cars drove to the end of the block, made a right on Chestnut, made a left on 55th, and parked. (LD 1 at 772-76.)  Half Pint got out of the car he was in. (*Id.* at 781.)  Roc, another gang member, said that Half Pint was "going to get to do an M Hat." (*Id.* at 782.)

[13]  Officer Prell testified that Petitioner had told him that he assumed Half Pint was armed but he wasn't sure. (LD 3 at 1286.)

[14]  Petitioner told police that they waited about 10 minutes in the car for Half Pint to return, heard gunshots, and then saw Half Pint running back with a revolver in his hand. (LD 1 at 784-87.)

[15]  Petitioner told police that after Half Pint returned he got into Petitioner's car, that Half Pint told Petitioner to take him home, and he did so. (LD 3 at 788-91.)

1  they did, Half-Pint told defendant and the other gang members, "He's

2  gone," and "I got him. I shot him."[16]

3  (LD 8 at 18-19) (footnotes added.)  Accordingly, "[t]he evidence was sufficient to

4  show that [Petitioner] knew of Half-Pint's intent to kill, and that [Petitioner] aided

5  and abetted the commission of Rene Gamora's murder by waiting for Half-Pint

6  while the crime was committed and then driving him home from the murder

7  scene." (*Id.* at 19.)

8         Petitioner's argument about the jury's findings on the overt acts is

9  misguided.  Petitioner is correct that the jury found Overt Acts 3 and 4 to be not

10  true.  (LD 1 at 846.)  Overt Act 3 states "that on September 13, 2000, the

11  defendant, the Insane Crip gang members, and others agreed to arm themselves

12  with handguns." (*Id.*)  Overt Act 4 states "that on September 13, 2000, the

13  defendant, the Insane Crip gang members, and others agreed to go to rival gang

14  territory armed with handguns." (*Id.*)  However, logically, just because Petitioner

15  did not *agree* with gang members to arm themselves, or to go to rival gang

16  territory armed, does not mean there was insufficient evidence that Petitioner

17  knew that Half Pint planned to kill someone and that Petitioner aided and abetted

18  a murder.

19         Based on the evidence, "any rational trier of fact could have found the

20  essential elements of the crime beyond a reasonable doubt." *Jackson*, 443 U.S.

21  at 318-19.  Nor has Petitioner presented any evidence that the state court's

22  factual determinations, which are clearly supported by the trial record, are

23  incorrect.  Thus, his claim fails.

24

25         [16] Half Pint exited the car and went into his apartment building.  (LD 3 at
    791-92.)  Petitioner waited for 10-15 minutes for the other cars to arrive, which
26  they did.  (*Id.* at 792-93.)  Later, after driving around, they came back to Half
    Pint's apartment complex and discovered Half Pint in the alley.  (*Id.* at 795-97.)
27  Half Pint said "he's gone" and made a "blowing sound"; Half Pint also said "I got
    him." (*Id.* at 797-99.)  Petitioner interpreted Half Pint's statements and sounds to
28  mean that Half Pint was referring to "the guy he shot." (*Id.* at 799.)

## 2.   Ground Ten - Gang Membership

In addition to finding Petitioner guilty of the murder of Gamora, the jury also found that the murder "was committed for the benefit of, at the direction of, and in association with a criminal street gang with the specific intent to promote, further and assist in criminal conduct by gang members." (LD 1 at 845.)  According to the California Court of Appeal, "[f]or the gang enhancement to apply, the prosecution must prove . . . that the gang includes members who either individually or collectively engaged in a pattern of criminal activity by committing, attempting to commit or soliciting two or more predicate offenses during the statutorily defined period (at least one offense committed after September 26, 1988, and the last of the offenses committed within three years after a prior offense), by two or more persons, committed on separate occasions." (LD 8 at 21-22.)  The court found the testimony of Sean Hunt, a gang expert, to provide sufficient evidence that he was familiar with Long Beach gangs (LD 3 at 1586), that Petitioner's grandmother's house was used as a meeting place for the Insane Crips (*id.* at 1610), that the two passengers in Petitioner's car on the night of the Gamora murder were members of the Insane Crips gang (*id.* at 1597), and that Petitioner and others in photographs found in Petitioner's car used hand signs associated with the Insane Crips (*id.* at 924-25, 1595). (LD 8 at 22-23.)  Thus, "Officer Hunt's opinions and the facts of the present case constitute substantial evidence to support the finding that the crimes were committed to promote gang activities." (*Id.* at 23.)

In addition, as the Court of Appeal found, there was evidence that Petitioner "knew a gang member named Half-Pint intended to commit the crime, that he intended to assist in its commission in association with [the two passengers in his car], and that he knew that Half-Pint [and the two passengers] were members of the Insane Crips gang.  The jury could reasonably infer that he intended to assist criminal conduct by his fellow gang members." (*Id.*)

1    Petitioner's contentions to the contrary are contradicted at the same time

2    as they are offered.  For example, he says he did not know Half Pint was armed.

3    (Reply at Ground 10 (2).)  However, he acknowledges that he assumed he was

4    armed.  (*Id.*)  Petitioner states there was no "direct evidence of an intent to benefit

5    or promote" the gang, but he acknowledges that the intent can be inferred from

6    his behavior.  (*Id.*)

7        Petitioner's claim fails.

8    **H.    GROUND NINE - <u>Corpus Delicti</u>**

9        Petitioner contends that there was insufficient evidence to convict him of

10   conspiracy because there was insufficient evidence independent of his out-of-

11   court statements of the corpus delicti of conspiracy.  In California, the corpus

12   delicti rule "requires that the prosecution establish the corpus delicti of a crime by

13   evidence independent of the defendant's extrajudicial inculpatory statements

14   before he . . . may be held to answer a criminal complaint . . ., be convicted of an

15   offense, or hear the statements repeated as evidence in court."  (LD 8 at 20

16   (internal quotation marks omitted) (citation omitted).)  The corpus delicti "consists

17   of at least slight evidence that somebody committed a crime."  (*Id.*)  Such

18   evidence may be circumstantial.  (*Id.*)  Once the rule has been satisfied, "the

19   defendant's admissions may be considered for all issues."  (*Id.*)

20       Although Petitioner characterizes this ground as a claim of insufficient

21   evidence, application of the corpus delicti rule is not constitutionally mandated by

22   *Jackson.  See West v. Johnson*, 92 F.3d 1385, 1393-94 (5th Cir. 1996), *cert.*

23   *denied*, 520 U.S. 1242 (1997).  In any event, the California Court of Appeal found

24   that, contrary to Petitioner's assertion, there was evidence Petitioner "was

25   present during the Gamora shooting to support a fellow gang member, and to aid

26   his escape."  (LD 8 at 20.)  Maria Valle and her aunt heard gunshots, observed a

27   car with tinted windows and its engine running.  (*Id.*)  The license plate they

28   copied down was "nearly identical" to that of Petitioner's car, which also had

29

1    tinted windows.  (*Id.* at 20-21.)  There was evidence that Petitioner was a

2    member of the Insane Crip gang, including photographs in his car showing him

3    making hand signs while with other gang members.  (*Id.* at 21.)

4         Petitioner's claim fails.

5    **I.    GROUND TWELVE:  <u>Enhancement Due Process Violation</u>**

6         "A person's right to reasonable notice of a charge against him, and an

7    opportunity to be heard in his defense – a right to his day in court – are basic in

8    our system of jurisprudence."  *In re Oliver*, 333 U.S. 257, 273, 68 S. Ct. 499, 92 L.

9    Ed. 682 (1948).  This guarantee is applicable to the states through the due

10   process clause of the Fourteenth Amendment.  *Cole v. Arkansas*, 333 U.S. 196,

11   201, 68 S. Ct. 514, 92 L. Ed. 644 (1948).

12        Petitioner argues that he was charged with a gun use enhancement but

13   convicted of a gun discharge enhancement.  Therefore, he was not given proper

14   notice of the charges, and his conviction violates his due process rights.

15   Respondent contends that Petitioner's failure to object at trial and at sentencing is

16   a procedural bar and, alternatively, that his claim fails on the merits.

17        **1.    California Proceedings**

18        The amended information filed on November 14, 2003, charged Petitioner

19   with murdering Rene Gamora (Count 1).  (LD 1 at 444.)  It also charged Petitioner

20   with various overt acts, including that Petitioner and others "drove around looking

21   to shoot rival gang members," that Petitioner waited while a gang member "got

22   out of the car to shoot a gang rival," and that "[a]fter [the] September 13, 2000,

23   fatal shooting of Rene Gomera (sic), the defendant waited while Half Pint got into

24   his car, and drove Half Pint home from near where Half Pint had killed Gomera

25   (sic)."  (*Id.* at 445-46.)  Petitioner was also charged as to Count 1 (and others)

26   "that a principal personally used a firearm, a handgun, within the meaning of

27

28

                                          30

1   Penal Code section 12022.53(b) and (e)(1)."[17] (*Id.* at 448.) Petitioner was not

2   charged with subdivision (d) of the same section.[18]

3     When Petitioner was tried the first time, the "jury deadlocked on all counts

4   and a mistrial was declared." (LD 8 at 2.)

5     At the conclusion of testimony in the second trial, the court discussed the

6   jury instructions with counsel. It was agreed they would use the same

7   instructions as were used in the first trial. (LD 3 at 1828.) One of the instructions

8   the court then gave was: "It is also alleged in Counts One . . . that a principal

9   intentionally and personally discharged a firearm and proximately caused great

10   bodily injury or death to a person during the commission of the crimes charged."

11   (*Id.* at 1872.)

12     After giving the jury instructions, the court and counsel had the following

13   discussion:

14     COURT: Principal personally discharged, that's 12022.53(b).

15     PROSECUTOR: It's actually (d) and (e)(1).

16     COURT: It's alleged here (b). Proximately caused is (d) and (e). It's

17     not (b). (b) is personally used.

18     PROSECUTOR: (d) and (e)(1) applied to a principal proximately

19     causing great bodily injury or death.

20     COURT: It's Penal Code Section 12022.53.

21     PROSECUTOR: Should be (d) and (e)(1).

22     DEFENSE COUNSEL: But that's not the way the information reads.

23   ————————————————

24    [17] Cal. Penal Code § 12022.53(b) states that "any person who, in the
commission of a felony specified in subdivision (a), personally uses a firearm,

25   shall be punished by an additional and consecutive term of imprisonment in the
state prison for 10 years."

26    [18] Subdivision (d) states that "any person who, in the commission of a
felony specified in subdivision (a) . . ., personally and intentionally discharges a

27   firearm and proximately causes great bodily injury . . . or death, to any person
other than an accomplice, shall be punished by an additional and consecutive

28   term of imprisonment in the state prison for 25 years to life."

1      COURT:  No.

2      PROSECUTOR:  I noticed that too right now.

3      COURT:  I have added that to the top, the code sections to the top of

4           those instructions.

5    (*Id.* at 1875-76.)

6         The jury found true the enhancement at Section 12022.53(d) and (e)(1),

7    namely intentionally discharging a firearm causing great bodily injury or death.

8    (LD 1 at 845.)

9              **2.    Procedural Bar**

10        "A federal court will not review questions of federal law decided by a state

11   court if the decision also rests upon a state law ground that is independent of the

12   federal question and adequate to support the judgment." *Melendez v. Pliler*, 288

13   F.3d 1120, 1124 (9th Cir. 2002) (citing *Coleman v. Thompson*, 501 U.S. 722,

14   729-30, 111 S. Ct. 2546, 115 L. Ed. 2d 640 (1991)).  To be "independent," the

15   state rule must not be interwoven with federal law.  *Coleman*, 501 U.S. at 733;

16   *see Park v. California*, 202 F.3d 1146, 1151 (9th Cir.), *cert. denied*, 531 U.S. 918

17   (2000).  The "adequacy of [the state law ground] to foreclose review 'is itself a

18   federal question.'" *Melendez*, 288 F.3d at 1124 (quoting *Douglas v. Alabama*,

19   380 U.S. 415, 422, 85 S. Ct. 1074, 13 L. Ed. 2d 934 (1965)).  "To be 'adequate,'

20   the state procedural bar must be 'clear, consistently applied, and well-established

21   at the time of the petitioner's purported default.'" *Id.* (citation omitted).

22        *Michigan v. Long*, 463 U.S. 1032, 103 S. Ct. 3469, 77 L. Ed. 2d 1201

23   (1983) held that a federal court "may reach the federal question on review unless

24   the state court's opinion contains a 'plain statement' that [its] decision rests upon

25   adequate and independent state grounds." *Harris v. Reed*, 489 U.S. 255, 261,

26   109 S. Ct. 1038, 103 L. Ed. 2d 308 (1989) (quoting *Long*, 436 U.S. at 1042)

27   (footnote omitted).  "[T]he mere fact that a federal claimant failed to abide by a

28   state procedural rule does not, in and of itself, prevent this court from reaching

                                              32

1   the federal claim: '[T]he state court must actually have relied on the procedural

2   bar as an independent basis for its disposition of the case.'  Furthermore,

3   ambiguities in that regard must be resolved by application of the *Long* standard."

4   *Harris*, 489 U.S. at 261-62 (quoting *Caldwell v. Mississippi*, 472 U.S. 320, 327,

5   105 S. Ct. 2633, 86 L. Ed. 2d 231 (1985)).

6          The Court of Appeal said there was no objection to the jury instructions, nor

7   any objection to the lack of notice. (LD 8 at 28.)  The court acknowledged that

8   defense counsel "noted the discrepancy between the information and the jury

9   instructions but failed to make an express objection or take any further action."

10  (*Id.*)  The court cited to *People v. Toro*, 47 Cal. 3d 966, 254 Cal. Rptr. 811 (1989)

11  when claiming lack of objection. (*Id.*)  The court found that Petitioner "had notice

12  of the possibility of an enhanced sentence based on discharge of a firearm

13  resulting in Rene Gamora's murder.  The jury in defendant's first trial was

14  instructed pursuant to section 12022.53, subdivision (d), and the parties agreed

15  that the same instruction would be given in the second trial.  Defendant did not

16  object based on lack of notice when the jury was instructed pursuant to section

17  12022.53, subdivision (d) in the second trial." (*Id.* at 30.)  "Under these

18  circumstances, defendant's failure to object to the section 12022.53, subdivision

19  (d) instructions, verdict form, and enhancement waived or forfeited any objection

20  based on lack of notice. (*Id.* (citing to *Toro*, 47 Cal. 3d at 976).)  The court

21  highlighted the following language from the California Supreme Court case:

22              [I]t has been uniformly held that where an information is amended at

23              trial to charge an additional offense, and the defendant neither

24              objects nor moves for a continuance, an objection based on lack of

25              notice may not be raised on appeal.  There is no difference in

26              principle between adding a new offense at trial by amending the

27              information and adding the same charge by verdict forms and jury

28              instructions . . . [A] reasonable and fair rule in both situations that a

1 | failure to promptly object will be regarded as a consent to the new

2 | charge and a waiver of objection based on lack of notice.

3 (*Id.* (quoting from *Toro*, 47 Cal. 3d at 976).)  The Court of Appeal then concluded

4 that Petitioner "cannot reasonably claim lack of notice concerning the

5 enhancement, and waived or forfeited any such claim as the result of his failure to

6 object at trial.  Imposition of the section 12022.53, subdivision (d) enhancement

7 accordingly did not violate [Petitioner's] right to due process." (*Id.* at 31.)

8 Respondent argues that the Court of Appeal "explicitly applied the doctrine

9 of procedural bar to Petitioner's lack of notice claim." (Answer at 15.)

10 Respondent relies generally on the viability of the so-called "contemporaneous-

11 objection" rule.  *See Wainwright v. Sykes*, 433 U.S. 72, 87, 97 S. Ct. 2497, 53 L.

12 Ed. 2d 594 (1977) ("a federal habeas petitioner who has failed to comply with a

13 State's contemporaneous-objection rule at trial must show cause for the

14 procedural default and prejudice attributable thereto in order to obtain review of

15 his defaulted constitutional claim").

16 The California Court of Appeal did not "clearly and expressly state[] that is

17 judgment rest[ed] on a state procedural bar." *Harris*, 489 U.S. at 263 (internal

18 quotation marks and citations omitted).  Rather, the court's finding of lack of

19 objection was interwoven with its finding that Petitioner had received adequate

20 notice and his due process rights were not violated.  After the court reviewed the

21 history of the enhancement confusion, including the discussion between the trial

22 court and counsel, the Court of Appeal stated:  "In light of the foregoing,

23 defendant cannot validly claim that he was not given proper notice of the

24 enhancement under section 12022.53, subdivision (d).  There was no objection to

25 the instructions, nor any objection based on lack of notice." (LD 8 at 28.)  And,

26 again at the end of this section of the state opinion, the Court of Appeal stated,

27 "Defendant cannot reasonably claim lack of notice concerning the enhancement,

28 and waived or forfeited any such claim as the result of his failure to object at trial.

34

1  Imposition of the section 12022.53, subdivision (d) enhancement accordingly did

2  not violate defendant's right to due process." (*Id.* at 31.)

3      Any ambiguity "must be resolved by application of the *Long* standard."

4  *Harris*, 489 U.S. at 262; *see also Kentucky v. Stincer*, 482 U.S. 730, 735 n.7, 107

5  S. Ct. 2658, 96 L. Ed. 2d 631 (1987) ("when . . . a state court decision fairly

6  appears . . . to be interwoven with the federal law, and when the adequacy and

7  independence of any possible state law ground is not clear from the face of the

8  opinion, we shall assume that the state court believed that federal law compelled

9  its conclusion") (internal quotation marks and citation omitted).

10      "*[I]f it is unclear* whether the state court dismissed the petition because of a

11  state law procedural default or on the merits of the petitioner's federal

12  constitutional claims, a federal court may review the merits of the claims

13  presented." *Loveland v. Hatche*r, 231 F.3d 640, 643 (9th Cir. 2000) (citation

14  omitted) (emphasis in original); *see also Siripongs v. Calderon*, 35 F.3d 1308,

15  1317-18 (9th Cir. 1994) ("Basing a procedural default upon an ambiguous order

16  that did not clearly rest on independent and adequate state grounds would defeat

17  one of the primary goals of the plain statement rule: providing the state courts a

18  means of avoiding federal court intrusion into state jurisprudence while ensuring

19  federal court review of constitutional questions."), *cert. denied*, 513 U.S. 1183

20  (1995).

21      Accordingly, the procedural bar is rejected.

22      **3.    Clearly Established Federal Law**

23      In *Cole*, the only United States Supreme Court case to squarely address

24  this issue, the petitioner was charged with a violation of Section 2 of Act 193,

25  which stated that it was "unlawful for any person acting in concert with one or

26  more other persons, to assemble at or near any place where a 'labor dispute'

27  exists and by force or violence prevent . . . any person from engaging in any

28  lawful vocation, or for any person acting . . . in concert with one or more persons,

35

1   to promote, encourage, or aid any such unlawful assemblage." *Cole*, 333 U.S. at

2   198 (quoting from the statute).[19]  The trial court read Section 2 to the jury and

3   instructed them that Section 2 included two offenses:  (1) "the concert of action

4   between two or more persons resulting in the prevention of a person by means of

5   force and violence from engaging in lawful vocation" or (2) "promoting,

6   encouraging or aiding of such unlawful assemblage by concert of action." *Id.* at

7   199.  The trial court explained to the jury that the *second* offense was the one

8   "charged in the information here . . . [and] the one on trial in this case." *Id.*

9   "Thus, the petitioners were clearly tried and convicted by the jury for promoting an

10  unlawful assemblage made an offense by s 2, and were not tried for the offense

11  of using force and violence as described in s 1." *Id.*

12         The Arkansas Supreme Court, on appeal, found that the information

13  accused petitioners of using force and violence and affirmed the convictions

14  under Section 1, "an offense for which they were neither tried nor convicted." *Id.*

15  at 200-01.  The United States Supreme Court found it "doubtful . . . that the

16  information fairly informed them" of a charge under Section 1. *Id.* at 201.

17  Moreover, it was "certain that they were not tried for or found guilty" of a violation

18  of Section 1. *Id.*  Accordingly, petitioners' due process rights were violated. *Id.*

19  ("No principle of procedural due process is more clearly established than that

20  notice of the specific charge, and a chance to be heard in a trial of the issues

21  raised by that charge, if desired, are among the constitutional rights of every

22  accused in a criminal proceeding in all courts, state or federal.") (citations

23  omitted).[20]

24  _____

25         [19]  By contrast, Section 1 of the same Act stated that it was "unlawful for
     any person by the use of force or violence, or threat of the use of force or
26  violence, to prevent or attempt to prevent any person from engaging in any lawful
     vocation within this State." *Id.* at 199 n.2 (quoting from the statute).

27         [20]  The court also cited to *De Jonge v. State of Oregon*, 299 U.S. 353, 362,
     57 S. Ct. 255, 81 L. Ed. 278 (1937) for the proposition that "[i]t is as much a
28  violation of due process to send an accused to prison following conviction of a

1    A recent Ninth Circuit decision discussed the *Cole* decision.  *Gautt v.*

2    *Lewis*, 489 F.3d 993, 1004 (9th Cir. 2007).  The information charged Gautt with

3    murder and possession of a firearm by a felon.  *Gautt*, 489 F.3d at 998.  The

4    information also charged him with the personal use enhancement under section

5    12022.53(b), the same as here.  *Id.*  "The information made no reference to

6    section 12022.53(d)."  *Id.* at 998-99  "[T]he trial court confused the two statutes

7    when time came to instruct the jury.  While ostensibly reciting the elements for

8    section 12022.53(b), the trial judge actually recited those additional elements

9    unique to section 12022.53(d)."  *Id.* at 999.  Nor did any party object to the

10    erroneous instruction.  *Id.* at 999 n.5.  The prosecutor tried the case on the

11    assumption that subsection (b) was at issue.  In closing argument, the prosecutor

12    "specifically disavowed any need to show that Gautt had intentional *discharged*

13    the weapon, the requirement unique to section 12022.53(d)."  *Id.* at 1000.  The

14    verdict form referred to subdivision (b) but "listed the personal discharge and

15    proximate causation elements unique to section 12022.53(d)," although it "did not

16    include section 12022.53(d)'s element of intentional discharge."  *Id.* at 1001.

17    Based on *Cole*, the Ninth Circuit held that "a criminal defendant has a right,

18    guaranteed by the Sixth Amendment and applied against the states through the

19    Fourteenth Amendment, to be informed of any charges against him."  *Id.* at 1004.

20    "When determining whether a defendant has received fair notice of the charges

21    _____

22    charge on which he was never tried as it would be to convict him upon a charge
      that was never made."  In *De Jonge*, the defendant was convicted of criminal

23    syndicalism in Oregon.  Criminal syndicalism was statutorily defined as "the
      doctrine which advocates crime, physical violence, sabotage, or any unlawful acts

24    or methods as a means of accomplishing or effecting industrial or political change
      or revolution."  *Id.* at 357 (quoting from statute).  However, in reality, the

25    defendant, an avowed communist, had attended a meeting of the Communist
      Party, which advocated criminal syndicalism, but defendant had not at that

26    meeting committed any acts of criminal syndicalism.  *Id.* at 362 ("Having limited
      the charge to defendant's participation in a meeting called by the Communist

27    Party, the state court sustained the conviction upon that basis regardless of what
      was said or done at the meeting.").  *De Jonge* stated more explicitly that the

28    indictment must be taken "as thus construed" and that "[c]onviction upon a charge
      not made would be sheer denial of due process."  *Id.*

1   against him, we begin by analyzing the content of the information." *Id.* at 1003

2   (citations omitted). "[A] charging document, such as an information, is the means

3   by which such notice is provided." *Id.* at 1004. "[T]he charging document need

4   not contain a citation to the specific statute at issue; the substance of the

5   information, however, must in some appreciable way apprise the defendant of the

6   charges against him so that he may prepare a defense accordingly." *Id.* (footnote

7   omitted).

8        The Ninth Circuit further assumed, without deciding, that "Supreme Court

9   precedent allows us to consider sources beyond the charging document when

10  deciding whether [Petitioner] had been given constitutionally sufficient notice of a

11  charge." *Id.* at 1014; *Id.* at 1010 (assuming other sources "can be parsed for

12  evidence of notice to the defendant"). The other sources included evidence

13  presented at the preliminary hearing or trial, the jury instructions, closing

14  arguments, and the jury's verdict. *Id.* at 1010-14. The Ninth Circuit noted that

15  "the Supreme Court – the only court whose jurisprudence is relevant for purposes

16  of AEDPA – has never held that non-charging-document sources can be used to

17  satisfy the Constitution's notice requirement in the present context." *Id.* at 1009

18  (footnote omitted). The converse is also true. The Supreme Court has never

19  held that such sources *cannot* be used.

20       Finally, the Ninth Circuit assumed, without deciding, that harmless error

21  review applies to any constitutional defect. *Id.* at 1014, 1016.

22       The Ninth Circuit found that the California appellate court stated the correct

23  legal framework under federal law. *Id.* at 1006. However, the court found that

24  the state court's conclusion was an unreasonable application of clearly

25  established federal law. *Id.* at 1008. "Gautt's constitutional right to be informed

26  of the charges against him was violated by this stark discrepancy between the

27  crime charged and the crime of conviction." *Id.* Consideration of other sources –

28  including the evidence, closing argument, instructions and verdict – indicated that

1   the prosecution focused on proof of personal use under subsection (b), and not

2   intentional discharge of a gun causing great bodily injury or death under

3   subsection (d). *Id.* at 1010-14. The Ninth Circuit further found that the

4   constitutional error was not harmless under *Brecht*. *Id.* at 1016-17. The Court

5   ordered the district court to issue a conditional writ of habeas corpus, although it

6   noted that nothing would prevent the state from re-sentencing Gautt under the

7   ten-year sentence enhancement provided by Cal. Penal Code § 12022.53(b). *Id.*

8   at 1017-18.

9         **4.   Application of Clearly Established Federal Law to the Petition**

10       We begin, as the Ninth Circuit did, with the First Amended Information filed

11   November 14, 2003. Like *Gautt*, the amended information contained an

12   enhancement allegation which charged that "a principal personally used a

13   firearm, a handgun, within the meaning of Penal Code section 12022.53(b) and

14   (e)(1)." (LD 1 at 448.) There is no mention of subsection (d) or personal and

15   intentional discharge of a firearm that proximately causes great bodily injury or

16   death.[21]

17       On the other hand, Count 2 for conspiracy to commit murder alleged overt

18   acts indicating the elements of subsection (d). Petitioner, the Insane Crips gang

19   members, and others "agreed to arm themselves with handguns" and "agreed to

20   go to rival gang territory armed with handguns." (LD 1 at 445, Overt Acts III and

21   IV.) On September 13, 2000, Petitioner "followed other Insane Crip gang

22   members and associates to rival gang territory, where he drove in tandem with

23   others looking for rival gang members to shoot." (*Id.* at 445-46, Overt Acts V, VI,

24   VII.) Petitioner "waited while Insane Crip gang member Half Pint . . . got out of

25   another car to shoot a gang rival." (*Id.* at 446, Overt Act VIII.) "After September

26   _____

27      [21] The Court of Appeal noted that the amended information contains a handwritten interlineation crossing out subdivision (b) and adding subdivision (d)

28   to Count III. However, the record does not indicate when or by whom the correction was made. (LD 8 at 26.)

13, 2000, fatal shooting of Rene Gomera, the defendant waited while Half Pint got into his car, and drove Half Pint home from near where Half Pint had killed Gomera." (*Id.*, Overt Act IX.)  The fair import of the substance of the information was a conspiracy to commit first degree murder – the personal and intentional shooting of Gamora to death.

Examination of the other sources – which the Ninth Circuit assumed could be reviewed without deciding the question – confirms that Petitioner was on notice of the discharge enhancement throughout the case.  The other sources include: (1) the jury instruction in the first trial (which was used in the second trial at issue here); (2) evidence at the preliminary hearing; (3) the prosecutor's closing argument; and (4) the jury verdict.

Petitioner was charged with first degree murder on a theory of aiding and abetting the principal, Half Pint.  In the first trial, the jury instruction about subsection (d) was given.  The instruction was not "muddled" with subsection (b) like the jury instruction in *Gautt*.  Moreover, the subsection (d) instruction was clearly given in advance of the second trial, thereby giving notice to Petitioner and allowing his counsel to properly prepare a defense, if he hadn't prepared already.  Unlike Gautt, Petitioner was charged with first degree murder, which requires a deliberate, intentional act and overlaps two of the elements of subdivision (d) (intent and causing death).

Moreover, the evidence at the preliminary hearing clearly gave notice of an intentional discharge of a firearm causing death.  Officer Lawrence testified that he found the victim, who had been shot and was dead. (LD 1 at 36.) Lawrence testified that he spoke with a witness named Jesus Garcia who said that he had seen a hand with a gun in it protruding through the doorway and heard four to five gunshots. (*Id.* at 38-39.) Detective McGuire testified that Petitioner told him that Half Pint "walked up to a male Hispanic that was in a doorway or a walkway, and shot him multiple times and then ran back." (*Id.* at 219.) Detective Lasiter

40

1   testified that Half Pint left his car for about 10-15 minutes, that Petitioner heard

2   gunshots, and that Half Pint returned carrying a gun. (*Id.* at 311-13.) Petitioner

3   also told Lasiter that Half Pint subsequently said "I got him," "made a sound and

4   motioned with his hand, something to the effect of (indicating) 'He's gone.' And

5   Oden took that to mean that Half Pint killed the individual." (*Id.* at 315.)

6   Petitioner also told Lasiter that "Half Pint said – when they congregated after the

7   shooting – that Oden – or that Half Pint had gone into this guy's house and got

8   him." (*Id.*) There was no indication at the preliminary hearing that the shooting

9   by Half Pint was anything but an intentional discharge of a firearm causing

10   Gamora's death.

11       The prosecutor's closing argument reflected the theory of first degree

12   murder by intentionally discharging a gun causing death. The prosecutor said:

13   "Did a principal use a gun causing the murder? Principal is a term meaning we

14   don't know who did it, but somebody pulled a gun and somebody did the

15   shooting." (LD 3 at 2145.) Specifically with respect to the Gamora murder, the

16   prosecutor stated: "Somebody used a gun to kill him. Principal used a gun to

17   kill."[22] (*Id.* at 2146.)

18       Finally, the jury was instructed on subsection (d), and the verdict form in

19   the instant case cited to subsection (d) and used its language. (LD 1 at 845.)

20   The jury found the discharge enhancement allegation true. (*Id.*)

21       This case, therefore, is materially distinguishable from *Gautt*, which did not

22   involve an intentional discharge of a gun. While under the influence of cocaine,

23   Gautt demanded of a woman named Fields that she pay him $25 for cocaine he

24   had given her the day before. Gautt threatened Fields by holding a gun close to

25   her. The gun went off killing Fields, but none of the other people in the room saw

26   the shooting. Gautt claimed the gun fired because Fields "reached up and

27   _____

28   [22] Defense counsel did not specifically mention the gun enhancement in
   closing. (*Id.* at 2147-76.)

1   knocked either his hand or the gun." *Gautt*, 489 F.3d at 998.  These facts do not

2   indicate that Gautt intentionally discharged the gun killing Fields.

3          Nor did the Ninth Circuit find that sources other than the information gave

4   Gautt notice that he was accused of intentionally discharging the weapon.  The

5   evidence at the preliminary hearing "suggest[ed] that Gautt acted in an especially

6   callous manner, [but did] not indicate that Gautt pulled the trigger on purpose – as

7   opposed to, for example, threatening her with the gun, which then went off

8   unintentionally." *Id.* at 1011.  Likewise, the evidence at trial "provide[d] a similarly

9   flimsy basis for determining that Gautt had notice of a potential conviction for

10  'intentionally and personally discharg[ing]' the handgun." *Id.*  The only possible

11  evidence was from an expert who testified that the design of the gun "made it

12  unlikely that his weapon discharged accidentally." *Id.*  Such evidence, standing

13  alone, was "insufficient." *Id.*  Nor did the trial instructions help as they were

14  "muddled" and poorly timed.[23] *Id.*  Finally, the prosecutor's closing argument was

15  "the clearest indication that the state never sought to prove that Gautt

16  'intentionally . . . discharged' the handgun." *Id.*  In *Gautt*, the prosecutor actually

17  said "that doesn't mean he intentionally pulled the trigger.  There's room for

18  arguing that.  That is not required.  The intentional act need only be, in this case,

19  the act of having a loaded gun.  The act of pointing a loaded gun." *Id.* at 1012.

20          **5.    Harmless Error**

21          Absent any guidance from the Supreme Court, the Ninth Circuit assumed,

22  without deciding, in *Gautt* that harmless error review applies to any constitutional

23  defect. *Id.* at 1014, 1016.  The Ninth Circuit noted that the United States

24  Supreme Court has never expressly decided whether a constitutional error of this

25  sort is structural or susceptible to harmless error analysis.  In *Chapman v.*

26

27          [23]  By poor timing, one assumes the Ninth Circuit meant late in the day as
28  it's hard to discern how jury instructions, as typically given, can provide a
    defendant notice of a charge such that he can prepare a defense.

1   *California*, 386 U.S. 18, 87 S. Ct. 824, 17 L. Ed. 2d 705 (1967), the Supreme

2   Court specifically addressed for the first time whether constitutional errors may be

3   considered harmless on collateral review. *Id.* at 20-21.  The court concluded that

4   "there may be some constitutional errors which in the setting of a particular case

5   are so unimportant and insignificant that they may, consistent with the Federal

6   Constitution, be deemed harmless, not requiring the automatic reversal of the

7   conviction." *Id.* at 22.  On the other hand, errors that are "so basic to a fair trial"

8   or that "affect substantial rights of a party" cannot be harmless. *Id.* at 23-24.

9   *Chapman* specifically noted three rights that cannot be harmless:  the admission

10  of a coerced confession, deprivation of the right to counsel, and a biased judge.

11  *Id.* at 24 n.8.

12       *Arizona v. Fulminante*, 499 U.S. 279, 111 S. Ct. 1246, 113 L. Ed. 2d 302

13  (1991) removed coerced confessions from the *Chapman* list of three structural[24]

14  errors. *Id.* at 295.  It also clarified that constitutional violations that are subject to

15  harmless error analysis involve "error which occurred during the presentation of

16  the case to the jury, and which may therefore be quantitatively assessed in the

17  context of other evidence presented in order to determine whether its admission

18  was harmless beyond a reasonable doubt." *Id.* at 307-08.  On the other hand,

19  structural errors, like deprivation of counsel and a biased judge, the entire trial is

20  affected; a structural error "affect[s] the framework within which the trial proceeds,

21  rather than simply an error in the trial process itself." *Id.* at 309-10.  At the same

22  time as the court removed coerced confessions from the *Chapman* list of

23  structural errors, it also recognized the addition of three more: the "unlawful

24  exclusion of members of the defendant's race from a grand jury, the right to self-

25  representation at trial, and the right to public trial." *Id.* at 310 (citations omitted).

26

27  _____

28       [24]  *Fulminante* used the term "structural defects" to mean errors that "defy
analysis by harmless-error standards." *Id.* at 280 (citations omitted).

43

1    (7) "Unless he knew what Half Pint was gonna do before he went up there

2    to do that, before he got out of the car, he's not an aider and abettor. Because

3    Terrell's mental state is not there. The intent to kill has to come before the

4    shooting." (*Id.* at 2169.)

5    (8) "If Half Pint did this on his own, which there is a very good likelihood he

6    did, cause he went up there and he shot somebody who was not a gang member,

7    who had nothing to do with anything that any of us know about." (*Id.* at 2171.)

8    (9) "Half Pint is guilty of murder. There's no question about it. Terrell is

9    not." (*Id.* at 2175.)

10    In summary, Petitioner had notice of the discharge enhancement charge.

11    Any error was harmless. Petitioner's claim fails.

12                                    **5.**

13                          **RECOMMENDATION**

14    For the reasons discussed above, it is recommended that the District Court

15    issue an Order (1) adopting this Report and Recommendation; and (2) directing

16    that judgment be entered denying the Petition.

17

18    DATED: September 11, 2007

19                                                    ALICIA G. ROSENBERG
                                                      United States Magistrate Judge

20

21

22

23

24

25

26

27

28

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

## NOTICE

Reports and Recommendations are not appealable to the Court of Appeals, but are subject to the right of any party to file Objections as provided in the Local Rules Governing Duties of Magistrate Judges, and review by the District Judge whose initials appear in the docket number.  No Notice of Appeal pursuant to the Federal Rules of Appellate Procedure should be filed until entry of the Judgment of the District Court.